UNITED STATES of America,
Plaintiff-Appellant,

v.

Fred Angelo PATACCHIA, Juliette V.
Coloma, Defendants-Appellees.

No. 79-1011.

United States Court of Appeals,
Ninth Circuit.

Aug. 13, 1979.

Bruce R. Castetter, Asst. U. S. Atty. (on the brief), Michael H. Walsh, U. S. Atty., Bruce R. Castetter, Asst. U. S. Atty. (argued), San Diego, Cal., for plaintiff-appellant.

Barton C. Sheela, Jr., San Diego, Cal., for defendants-appellees.

Before SNEED and TANG, Circuit Judges, and PFAELZER *, District. Judge.

SNEED, Circuit Judge:

The government appeals an order by the district court granting defendants' motion to suppress evidence. Defendants were charged with conspiracy to possess marijuana with intent to distribute and with possession of marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846. This court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1294.

We affirm the order of the district court.

I.

FACTS

This is a search at a fixed checkpoint case. The district court held the search was unsupported by either probable cause or consent. It therefore suppressed the evidence discovered in the search as required by *United States v. Martinez-Fuerte*, 428 U.S. 543, 567, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).[1] *See United States v. Rubalcava-Montoya*, 597 F.2d 140 (9th Cir. 1978). The facts, we think, support this conclusion and are as follows.

---

* Honorable Mariana R. Pfaelzer, United States District Judge for the Central District of California, sitting by designation.

1. The Supreme Court, in *United States v. Martinez-Fuerte,* was quite clear when it held:

In summary, we hold that stops for *brief questioning* routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by warrant. The principal protection of Fourth Amendment rights at checkpoints lies

On the morning of August 29, 1978, Border Patrol Agents Foster, Fullen and Davis were on duty at the San Clemente Border Patrol Checkpoint on Interstate Highway 5. Agent Foster was on "the point," standing behind a stop sign on the highway. His duties included making a preliminary determination whether a vehicle should be allowed to pass through the checkpoint unimpeded, or directed to pull into the secondary inspection area.

At approximately 10:00 a. m., defendant-appellee Patacchia approached the checkpoint driving a grey 1972 Oldsmobile. Defendant-appellee Coloma was Patacchia's sole passenger. Agent Foster watched the Oldsmobile approach and became suspicious of Patacchia's hard stare and Coloma's nervous demeanor. Foster observed that the vehicle was an older model with a large trunk, had no front license plate, and was a type of car often used to smuggle aliens. At the suppression hearing Foster testified that the Oldsmobile was equipped with heavy-duty shocks and was riding low in the rear, although this information did not appear in the arrest report.

Patacchia was directed by Foster to drive into the secondary inspection area, where Agents Fullen and Davis were on duty. Fullen and Davis inquired as to defendants' nationalities, and requested identification. All appeared to be in order. Agent Fullen asked Patacchia if he would open the trunk. Patacchia was obliging but said that the electric release was inoperative. After trying the electric release Patacchia got out of the car and showed the agents some body damage which, he claimed, made it impossible for him to open the trunk. He also stated that he did not have a trunk key.

Agent Fullen could detect no suspicious odors around the trunk. Fullen then handed defendants' identification to Agent Davis who also noticed that while the vehicle had no front license plate, it did have a temporary license taped to the back window. At that point, Patacchia, who had been amiable and cooperative, became impatient and requested that his identification be returned and that he be allowed to leave. The agents, assuming that defendants had something to hide, placed Patacchia in a patrol car. They then pried the trunk open enough to detect the odor of marijuana and to see some bundles wrapped in a fashion characteristic of such drugs. The agents thereupon arrested defendants and advised them of their constitutional rights.

A full search of the car yielded approximately 75 pounds of marijuana and a weighing scale. A search of Coloma's purse yielded $2,348 in cash and a key to the car's trunk.

## II.

### CONSENT

■ These facts do not evidence consent to search the trunk. It is true that Patacchia indicated a willingness to open the trunk when asked to do so; but his response was qualified. He could not open it, he said, because of the inoperative release switch, the damage to the rear of the car, and the absence of a trunk key. The response, "I would but I can't" is not the equivalent of "Yes, you may open it if you can."

■ The existence of consent to a search is not lightly to be inferred, and is a question of fact to be determined from the totality of circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The district court found consent did not exist. This finding is not clearly erroneous.

in appropriate limitations on the scope of the stop. (cites) (emphasis added). We have held that checkpoint searches are constitutional only if justified by consent or probable cause to search. *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). And our holding today is limited to

the type of stops described in this opinion. *"[A]ny further detention . . . must be based on consent or probable cause."* *United States v. Brignoni-Ponce, supra* [422 U.S. 873], at 882, 95 S.Ct. 2574, 45 L.Ed.2d 607. (emphasis added).

428 U.S. at 566–67, 96 S.Ct. at 3087.

## III.

### PROBABLE CAUSE

To establish probable cause, the government relies on: (1) defendants' nervousness, (2) the Oldsmobile's similarity to vehicles commonly used to smuggle illegal aliens, (3) the absence of a front license plate, (4) the presence of heavy-duty shocks, (5) the Oldsmobile's low ride in the rear, (6) Patacchia's statement that he did not have a trunk key when he was asked to open the trunk, and (7) Patacchia's sudden change in demeanor. The government contends that defendants' activities had proceeded to the point where a prudent person could say that an innocent course of conduct was substantially less likely than a criminal one. *United States v. Patterson*, 492 F.2d 995, 997 (9th Cir.), *cert. denied*, 419 U.S. 846, 95 S.Ct. 82, 42 L.Ed.2d 75 (1974).

The issue is a close one, but its proper resolution, we believe, must be against the government. Each fact on which the government relies is not inconsistent with a criminal course of conduct; likewise, each is not inconsistent with an innocent one. What is lacking is the fact or two necessary to convert a strong hunch into probable cause. Not quite enough exists here to make an innocent course of conduct *substantially* less likely than a criminal one; less likely, perhaps, but not *substantially* less likely.

Little would be achieved by analysis of each fact on which the government relies. Probable cause arises from the totality of the circumstances with which the agents are confronted. Our periodic judgments regarding the existence of probable cause cannot be expected to provide infallible guidelines. We, like the agents, are confronted with multiple arrangements of roughly similar facts to which we must respond in a manner consistent with the principles of law by which both of us are bound. Our disagreements have their source in our different functions which cause our perceptions to differ. Detection of crime is the function of law enforcement agents, while providing justice according to law that of judges. The perception of each is fashioned by the purpose served by each. Therefore, it must be from time to time that what to an officer is probable cause is to us but a not unreasonable hunch. So it is here.

AFFIRMED.